# EXHIBIT B

Case Number: CACE-13-016865 Division: 09
Electronically Filed 07/10/2013 01:51:14 PM ET

*** FILED: BROWARD COUNTY, FL HOWARD FORMAN, CLERK 7/10/2013 1:51:11 PM.****

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FLORIDA**

BIO-TECH MEDICAL SOFTWARE, INC.,

Plaintiff,

CASE NO.

vs.

MEDBOX, INC.,

Defendant.

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, BIO-TECH MEDICAL SOFTWARE, INC. ("BIO-TECH"), sues Defendant, MEDBOX, INC. ("MEDBOX"), and alleges:

**INTRODUCTION**

1. This action arises from MEDBOX's breach of a multi-million dollar Stock Purchase Agreement which was entered into with BIO-TECH in connection with a series of interlocking transactions that were designed to foster a mutually beneficial business relationship between the parties in the Legalized Marijuana and Prescription Drug industries, in which the parties are engaged.[1] Plaintiff, BIO-TECH, develops effective and cutting-edge technology solutions that (1) combat drug diversion and abuse; and (2) assist drug prescribers and dispensers with running their businesses to better comply with the law and to enjoy greater peace of mind, all without restricting patients with legitimate medical needs from obtaining the care and medication they require or compromising their privacy. In addition to a biometrics-based electronic prescribing system and a series of biometrics-based real-time anonymous Prescription Drug and methamphetamine precursor tracking systems, BIO-TECH provides the nation's most

---

[1] Currently, Medical Marijuana is legalized in eighteen (18) states, the District of Columbia, and Canada.

comprehensive and robust "seed-to-sale" marijuana tracking and regulatory compliance software suite on the market, "BioTrackTHC." Documenting real-time location, growth-phase, and production-phase inventory tracking, "BioTrackTHC" is the consummate technology tool that enables cultivators, processors, and retail vendors of Legalized Marijuana to comply with and meet state regulations while running their businesses more profitably and efficiently.

2. MEDBOX is a leading provider of biometric medicine machines used in the dispensing of Prescription Drug products. MEDBOX's machines were uniquely suited to provide a retail point-of-sale for dispensing Legalized Marijuana; however, MEDBOX lacked the back-end seed-to-sale inventory tracking that would allow MEDBOX machines to be a more marketable all-in-one system so that MEDBOX end-users could better comply with the stringent state regulatory requirements unique to the Legalized Marijuana industry. Further, MEDBOX's Prescription Drug machines could greatly benefit from integration with BIO-TECH's biometrics-based electronic prescribing technology and real-time anonymous Prescription Drug tracking technology. Consequently, MEDBOX solicited and convinced BIO-TECH to enter into the agreements which are the subject of this action. Combining BIO-TECH's software products with MEDBOX's medicine machines would empower MEDBOX with "best of breed" unified hardware and software delivery systems with which to dominate the Legalized Marijuana and Prescription Drug industries in which both parties are engaged.

## JURISDICTION, PARTIES, AND VENUE

3. At all times material to this action, BIO-TECH is a Florida corporation, operating and doing business in Ft. Lauderdale, Florida.

4. At all times material to this action, MEDBOX is a Nevada corporation, operating and doing business in Hollywood, California.

5. MEDBOX is subject to the jurisdiction of this Court under § 48.193(1)(g), Florida Statutes, because it breached a contract within this State and within this judicial district, causing damage to BIO-TECH within this judicial district.

6. Under § 47.011, Florida Statutes, venue is proper in Broward County, Florida because the cause of action alleged in this Complaint accrued in Broward County.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

7. BIO-TECH was formed in 2008 and grew under the auspices of the University of Central Florida's Business Incubation Program to develop patented software technology for the Prescription Drug and the Legalized Marijuana industries. BIO-TECH initially developed technologies in response to Florida's "pill mill" problem: technologies to combat Prescription Drug fraud, diversion, and abuse, as well as to prevent the accidental over-prescribing of medicine, all without compromising patient privacy. BIO-TECH utilized these patented, software technologies to develop a marijuana "seed-to-sale" enterprise resource planning, point-of-sale, reporting and compliance system known as "BioTrackTHC."

8. MEDBOX is engaged in the biometric medicine dispensing machine business. MEDBOX is a publicly-traded company whose shares currently trade under the symbol "MDBX" on the OTC markets.

9. MEDBOX solicited and convinced BIO-TECH to enter the various agreements which are the subject of this action. MEDBOX desired BIO-TECH's software technology; BIO-TECH was attracted to MEDBOX's Prescription Drug and Legalized Marijuana sales presence. MEDBOX also wooed BIO-TECH with its promise of providing capital for business expansion.

10. BIO-TECH and MEDBOX entered into the following agreements in conjunction with a wider business initiative of developing a collaborative working relationship between the companies:

a. On **February 8, 2013**, BIO-TECH and MEDBOX entered into Stock Purchase Agreement in which MEDBOX agreed, among other things, to provide BIO-TECH $1.5 Million in cash and 700,000 shares of MEDBOX common stock in exchange for 833,333 shares of BIO-TECH common stock;

b. On **February 8, 2013**, BIO-TECH and MEDBOX entered into a Technology License Agreement in which BIO-TECH agreed, among other things, to provide MEDBOX a nonexclusive, fully-paid, royalty-free license to incorporate "BioTrackTHC" software into MEDBOX's production hardware environment;

c. On **February 26, 2013**, BIO-TECH and MEDBOX entered into the Amended and Restate Stock Purchase Agreement, a true and correct copy of which is attached hereto as **Exhibit "A,"** in which MEDBOX agreed, among other things, to issue 700,000 shares of MEDBOX common stock to BIO-TECH and to pay BIO-TECH $1.5 million in exchange for 833,333 shares of Bio-Tech's common stock, dispensed and exchanged in equal amounts in three separate closings. The first closing was held on February 26, 2013, and the second and third closings were to be held on or before April 27, 2013, and May 27, 2013, respectively;

d. On **February 26, 2013**, BIO-TECH and MEDBOX entered into the Amended and Restated Technology License Agreement, a true and correct copy of which is attached hereto as **Exhibit "B,"** in which BIO-TECH affirmed the nonexclusive, fully-paid, royalty-free license of "BioTrackTHC" to MEDBOX;

e. On **May 13, 2013**, after MEDBOX had failed to make the second $500,000 install payment due on April 27, 2013 on the Amended and Restated Stock Purchase Agreement, BIO-TECH and MEDBOX entered into a letter extension amendment, a true and correct copy of which is attached hereto as **Exhibit "C,"** extending the second and third closings

until June 26, 2013, and August 25, 2013, respectively, in exchange for a nonrefundable $100,000 Extension Fee.

11. MEDBOX confirmed the existence and enforceability of the Amended and Restated Agreement in its recent preliminary Form 10 filing, dated April 10, 2013, stating:

> Pursuant to the *Amended and Restated Stock Purchase Agreement, we agreed to issue 700,000 shares of our common stock to Bio-Tech and pay Bio-Tech $1.5 million in exchange for 833,333 shares of Bio-Tech's common stock, with the exchange of 1/3 of each issuance of common stock and the cash to Bio-Tech to be exchanged at three separate closings. The first closing was held on February 26, 2013, and the second and third closings will be held on or before April 27, 2013 and May 27, 2013, respectively.* Pursuant to the terms of the Amended and Restated Stock Purchase Agreement, however, the shares of common stock to be issued to each party by the other will be held in escrow and released only after Bio-Tech shall have generated net income for two consecutive fiscal quarters after the date of the third closing. The shares of common stock issued to each party are subject to a lock-up period during which the holder thereof cannot re-sell the shares without the consent of the issuing party, which lock-up period expires 24 months after execution of the Amended and Restated Stock Purchase Agreement with respect to the shares of Medbox, Inc. common stock held by Bio-Tech, and 24 months after Bio-Tech becomes subject to the periodic reporting requirements of the Securities Exchange Act of 1934 with respect to the shares of Bio-Tech held by Medbox, Inc. In each case, there are limits on the number of shares of the other party that each party can re-sell once the lock-up period expires. (Emphasis added.)

12. Based upon MEDBOX's financial commitments: (1) BIO-TECH hired additional employees to expand product development, sales, and technical support capacity, doubling its payroll obligations; (2) vacated free office space and committed to leasing office space to handle the larger work force contemplated by the expanding relationship with MEDBOX; (3) invested substantial down payments on large projects; and (4) incurred substantial legal expenses to consummate the transactions with MEDBOX.

13. MEDBOX has since breached the Amended and Restated Stock Purchase Agreement, as amended, by failing to make the second $500,000 installment payment when due,

and refusing to make the third $500,000 installment payment due on August 25, 2013. Moreover, MEDBOX has disavowed its obligations under any of its agreements with BIO-TECH, including its obligation to ever allow 700,000 shares of common stock to be released to BIO-TECH.

14. As a direct and proximate result of MEDBOX's breaches, BIO-TECH has been damaged, including the consequential damages arising from the lack of the anticipated funding in the form of unnecessarily incurred expenses and lost profits on missed business opportunities.

15. BIO-TECH has retained the law firm of Morgan & Morgan, P.A., agreeing to pay reasonable attorney's fees for its services. BIO-TECH is entitled to recover attorney's fees under the Amended and Restated Stock Purchase Agreement.

16. All general and statutory conditions precedent to bringing this action have been performed, have occurred, have been waived, or have otherwise been excused by MEDBOX's actions.

**COUNT I**
**BREACH OF CONTRACT**

17. BIO-TECH sues MEDBOX for damages exceeding $15,000.00 for breach of contract.

18. BIO-TECH realleges, incorporates, and asserts by reference the allegations set forth above in Paragraphs 1 through 16.

19. BIO-TECH and MEDBOX entered into the Amended and Restated Stock Purchase Agreement, as amended.

20. MEDBOX breached the Amended and Restated Stock Purchase Agreement, as amended, by failing to make the second $500,000 installment payment when due and refusing to make the third $500,000 installment payment due on August 25, 2013. Moreover, MEDBOX

has disavowed its obligations under any of its agreements with BIO-TECH, including its obligation to ever allow 700,000 shares of common stock to be released to BIO-TECH.

21. As a direct and proximate result of MEDBOX's breaches, BIO-TECH has suffered direct and consequential damages, including the loss of $1,000,000 in cash consideration, the value represented by 700,000 shares of MEDBOX common stock currently trading within the past year as high as $215/share, and currently trading in a range of $27-29/share, losses from unnecessarily expensed costs, and lost profits from missed business opportunities.

**WHEREFORE**, BIO-TECH demands judgment against MEDBOX for direct and consequential damages, prejudgment interest, attorney's fees, and costs.

**JURY TRIAL DEMAND**

BIO-TECH demands a trial by jury for all issues so triable.

Dated this 10th day of July, 2013.

*s/ Tucker H. Byrd*
**Tucker H. Byrd**
Florida Bar No. 381632
**Scottie N. McPherson**
Florida Bar No. 085137
**MORGAN & MORGAN, P.A.**
20 North Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 420-1414
Facsimile: (407) 245-3406
Primary Email: TByrd@forthepeople.com
Secondary Email: SMcpherson@forthepeople.com
*Attorneys for the Plaintiff*

# AMENDED AND RESTATED STOCK PURCHASE AGREEMENT

This Amended and Restated Stock Purchase Agreement (the "**Agreement**") is effective as of February 26, 2013, by and between Medbox, Inc., a Nevada corporation, with an address at 8439 West Sunset Boulevard, Suite #101, West Hollywood, California 90069 ("**Medbox**") and Bio-Tech Medical Software, Inc., a Florida corporation with an address at 2805 E. Oakland Park Boulevard, Suite #250, Fort Lauderdale, Florida 33306 ("**Bio-Tech**"). Medbox and Bio-Tech are sometimes referred to herein individually, as a "**Party**" and collectively, as the "**Parties.**"

## RECITAL

**WHEREAS**, effective as of February 8, 2013, Medbox and Bio-Tech entered into a Stock Purchase Agreement (the "**Original SPA**"), pursuant to which Medbox agreed to acquire from Bio-Tech, 833,333 shares of Bio-Tech's authorized, but unissued common stock which represented twenty-five percent (25%) of Bio-Tech's issued and outstanding shares of common stock on a fully diluted basis as of the date of the Original SPA (the "**Bio-Tech Shares**") in exchange for $1,500,000 (the "**Cash Purchase Price**") and 700,000 shares of Medbox's authorized but unissued shares of common stock, which represented five percent (5%) of Medbox's issued and outstanding shares on a fully diluted basis as of the date of the Original SPA (the "**Medbox Shares**"), all on the terms and conditions set forth in the Original SPA; and

**WHEREAS,** the Parties wish to amend certain provisions of the Original SPA by entering into this Agreement and restating the Original SPA in its entirety.

## AGREEMENT

**NOW WHEREAS**, in consideration of the mutual representations, warranties and covenants of the Parties set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows

1. **SALE AND PURCHASE OF SECURITIES.**

1.1 **Sale and Purchase of Securities**. Subject to the terms and conditions set forth in this Agreement, Bio-Tech hereby sells the Bio-Tech Shares to Medbox and Medbox hereby purchases the Bio-Tech Shares from Bio-Tech, in exchange for payment by Medbox to Bio-Tech of the Cash Purchase Price and the issuance by Medbox to Bio-Tech of the Medbox Shares.

2. **THE CLOSINGS.**

2.1 **The Closings**. Subject to all of the terms and conditions set forth in this Agreement being satisfied, the transactions contemplated hereby shall be closed as follows:

2.1.1 On the date of this Agreement,



**EXHIBIT A**

*** FILED: BROWARD COUNTY, FL HOWARD FORMAN, CLERK 7/10/2013 1:51:11 PM.****

# AMENDED AND RESTATED STOCK PURCHASE AGREEMENT

This Amended and Restated Stock Purchase Agreement (the "**Agreement**") is effective as of February 26, 2013, by and between Medbox, Inc., a Nevada corporation, with an address at 8439 West Sunset Boulevard, Suite #101, West Hollywood, California 90069 ("**Medbox**") and Bio-Tech Medical Software, Inc., a Florida corporation with an address at 2805 E. Oakland Park Boulevard, Suite #250, Fort Lauderdale, Florida 33306 ("**Bio-Tech**"). Medbox and Bio-Tech are sometimes referred to herein individually, as a "**Party**" and collectively, as the "**Parties.**"

## RECITAL

**WHEREAS**, effective as of February 8, 2013, Medbox and Bio-Tech entered into a Stock Purchase Agreement (the "**Original SPA**"), pursuant to which Medbox agreed to acquire from Bio-Tech, 833,333 shares of Bio-Tech's authorized, but unissued common stock which represented twenty-five percent (25%) of Bio-Tech's issued and outstanding shares of common stock on a fully diluted basis as of the date of the Original SPA (the "**Bio-Tech Shares**") in exchange for $1,500,000 (the "**Cash Purchase Price**") and 700,000 shares of Medbox's authorized but unissued shares of common stock, which represented five percent (5%) of Medbox's issued and outstanding shares on a fully diluted basis as of the date of the Original SPA (the "**Medbox Shares**"), all on the terms and conditions set forth in the Original SPA; and

**WHEREAS,** the Parties wish to amend certain provisions of the Original SPA by entering into this Agreement and restating the Original SPA in its entirety.

## AGREEMENT

**NOW WHEREAS,** in consideration of the mutual representations, warranties and covenants of the Parties set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows

1. **SALE AND PURCHASE OF SECURITIES.**

1.1 **Sale and Purchase of Securities**. Subject to the terms and conditions set forth in this Agreement, Bio-Tech hereby sells the Bio-Tech Shares to Medbox and Medbox hereby purchases the Bio-Tech Shares from Bio-Tech, in exchange for payment by Medbox to Bio-Tech of the Cash Purchase Price and the issuance by Medbox to Bio-Tech of the Medbox Shares.

2. **THE CLOSINGS.**

2.1 **The Closings**. Subject to all of the terms and conditions set forth in this Agreement being satisfied, the transactions contemplated hereby shall be closed as follows:

2.1.1 On the date of this Agreement,



**EXHIBIT A**

(a) Bio-Tech shall issue to Medbox 277,777 Bio-Tech Shares;

(b) Medbox shall issue to Bio-Tech 233,333 Medbox Shares and shall pay to Bio-Tech the sum of $500,000 of the Cash Purchase Price; and

(c) the Parties (i) hereby reaffirm the Shareholders' Agreement in the form of **Exhibit A** made as of February 8, 2013 (the "**Shareholders' Agreement**") and (ii) shall enter into the Amended and Restated Technology License Agreement in the form of **Exhibit B** hereto (the "**License Agreement**") (the "**First Closing**").

2.1.2 At such time as may be mutually agreed to by the Parties, but in no event later than sixty (60) days from the date of this Agreement,

(a) Bio-Tech shall issue to Medbox 277,778 Bio-Tech Shares; and

(b) Medbox shall issue to Bio-Tech 233,333 Medbox Shares and shall pay to Bio-Tech the sum of $500,000 of the Cash Purchase Price (the "**Second Closing**").

2.1.3 At such time as may be agreed to by the Parties, but in no event later than ninety (90) days from the date of this Agreement,

(a) Bio-Tech shall issue to Medbox 277,778 Bio-Tech Shares; and

(b) Medbox shall issue to Bio-Tech 233,334 Medbox Shares and shall pay to Bio-Tech the sum of $500,000, being the balance of the Cash Purchase Price (the "**Third Closing**").

The First Closing, the Second Closing and the Third Closing are sometimes referred to herein individually, as a "**Closing**" and collectively, as the "**Closings**."

2.2 At the First Closing,

(a) Bio-Tech shall deliver (i) to Phillip E. Koehnke, APC, Post Office Box 235422, Encinitas, California 92024 (the "**Escrow Agent**"), three (3) certificates evidencing the Bio-Tech Shares being issued at the Closings registered in the name of Medbox, together with two (2) stock powers executed in blank by Bio-Tech (the "**Bio-Tech Share Documents**") and (ii) to Medbox, the Shareholders' Agreement and Licensing Agreement, duly executed by Bio-Tech; and

(b) Medbox shall deliver (i) to Bio-Tech, the portion of the Cash Purchase Price due at the First Closing together with the License Agreement and the Shareholders' Agreement, duly executed by Medbox and (ii) to the Escrow Agent, three (3) certificates evidencing the Medbox Shares being issued at each Closing registered in the name of

Bio-Tech, together with two (2) stock powers executed in blank by Medbox (the "**Medbox Share Documents**").

2.2.2 At each of the Second Closing and the Third Closings, Medbox shall deliver the portion of the Cash Purchase Price due at such Closing to Bio-Tech.

2.3 **Escrow of Share Documents**. The Bio-Tech Share Documents and the Medbox Share Documents shall be held in escrow by the Escrow Agent until (a) the Cash Purchase Price is paid in full; (b) Bio-Tech shall have prepared and delivered to Medbox, audited financial statements for the year ended December 31, 2012, prepared at Medbox's cost in accordance with U.S. generally accepted accounting principles consistently applied ("**GAAP**"); and (c) Bio-Tech shall have generated net income for two (2) consecutive fiscal quarters after receipt of all payments from Medbox, calculated in accordance with GAAP. Upon satisfaction of the foregoing conditions, the Parties shall jointly instruct the Escrow Agent in writing to release from escrow and deliver (a) the Bio-Tech Share Documents to Medbox and (b) the Medbox Share Documents to Bio-Tech. The Escrow Agent is acting solely as escrow agent for purposes of the transactions contemplated by this Agreement and shall be only obligated to act upon the joint written instructions of the Parties.

2.4 **Indemnification of the Escrow Agent**. The Parties jointly and severally, shall indemnify and hold harmless the Escrow Agent from all damages and liabilities arising out of or relating to this Agreement or the transactions contemplated hereby, other than by reason of the Escrow Agent's gross negligence or willful misconduct.

2.5 **Waiver of Conflicts**. The Parties have been informed of, understand and agree that the Escrow Agent may now, previously, or in the future represent Medbox. Accordingly, the Parties acknowledge that there may be conflicts of interest that may arise from time to time as a result of such representation. Accordingly, the Parties expressly waive any conflict of interest related to this Agreement or the transactions contemplated hereby with respect to the Escrow Agent as such. Furthermore, the Parties hereby acknowledge that in connection with the execution of this Agreement, the Parties were represented by independent legal counsel and that the parties have had the benefit of independent legal advice regarding the same.

**REPRESENTATIONS, WARRANTIES AND COVENANTS OF BIO-TECH.** Bio-Tech hereby represents and warrants to and covenants with Medbox as follows:

3.1 **Validity of Transactions**. This Agreement, and each document executed and delivered by Bio-Tech in connection with the transactions contemplated by this Agreement, have been duly authorized, executed and delivered by Bio-Tech and is each the valid and legally binding obligation of Bio-Tech, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency reorganization and moratorium laws and other laws affecting enforcement of creditor's rights generally and by general principles of equity.

3.2 **Valid Issuance of Bio-Tech Shares**. The Bio-Tech Shares that are being issued to Medbox in exchange for payment of the Cash Purchase Price and issuance of the Medbox Shares to Bio-Tech, when issued in accordance with the terms of this Agreement, will

be duly and validly issued, fully paid and non-assessable shares of common stock, free of restrictions on transfer, other than restrictions on transfer under this Agreement, the Shareholders' Agreement and under applicable Federal and state securities laws, and will be free of all other liens, adverse claims and encumbrances of any type and nature whatsoever.

3.3 **No Violation**. The execution, delivery and performance of this Agreement will not violate any law or any order of any court or government agency applicable to Bio-Tech, as the case may be, or the Articles of Incorporation or Bylaws of Bio-Tech, and will not result in any breach of or default under, or, except as expressly provided herein, result in the creation of any encumbrance upon any of the assets of Bio-Tech pursuant to the terms of any agreement or instrument by which Bio-Tech or any of its assets may be bound. No approval of or filing with any governmental authority is required for Bio-Tech to enter into, execute or perform this Agreement, except for applicable post-closing filings under Federal and applicable state securities authorities.

3.4 **Securities Law Compliance**. Assuming the accuracy of the representations and warranties of Medbox set forth in **Section 4** of this Agreement, the offer, sale and delivery of the Bio-Tech Shares will constitute an exempt transaction under the Securities Act of 1933, as amended (the "**Securities Act**") and registration of the Bio-Tech Shares under the Securities Act is not required. Bio-Tech shall make such post-closing filings as may be necessary to comply with applicable Federal and state securities laws, which filings will be made in a timely manner.

3.5 **Qualifications, Legal and Investment**. All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body of the United States including Federal and applicable state securities filings that are required in connection with the issuance of the Bio-Tech Shares pursuant to this Agreement have been or will be, on a timely basis, duly obtained and are effective. No stop order or other order enjoining the sale of Bio-Tech Shares have been issued and no proceedings for such purpose are pending or, to the knowledge of Bio-Tech, threatened by the Securities and Exchange Commission (the "**SEC**"), or any applicable state securities authorities. The sale of the Bio-Tech Shares is legally permitted by all laws and regulations to which Bio-Tech is subject.

3.6 **Receipt of Restricted Securities**. Bio-Tech has been advised that the Medbox Shares have not been registered under the Securities Act or any applicable state securities laws and that the Medbox Shares are being offered and sold pursuant to Section 4(a)(2) of the Securities Act and applicable state securities law exemptions, and that Medbox's reliance upon Section 4(a)(2) of the Securities Act and such applicable state securities law exemptions is predicated in part on Bio-Tech's representations and warranties as contained in this Agreement.

3.6.1 Bio-Tech acknowledges that the Medbox Shares have not been registered under the Securities Act or applicable state securities laws, are being offered and sold pursuant to applicable exemptions from such registration for nonpublic offerings, and will be "**restricted securities**" as defined by Rule 144 promulgated under the Securities Act. The Medbox Shares may not be resold in the absence of an effective registration thereof under the Securities Act and applicable state securities laws unless, in the opinion of Bio-Tech's counsel

(which opinion shall be reasonably satisfied to Medbox), an applicable exemption from registration thereunder is available.

3.6.2 Bio-Tech is acquiring the Medbox Shares for its own account, for investment purposes only and not with a view to, or for sale in connection with, a distribution, as that term is used in Section 2(11) of the Securities Act, in a manner which would require registration under the Securities Act and applicable state securities laws.

3.6.3 Bio-Tech understands and acknowledges that the Medbox Shares will bear the following legend:

> *THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD OR TRANSFERRED FOR VALUE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION THEREOF UNDER THE SECURITIES ACT OF 1933 AND/OR THE SECURITIES ACT OF ANY STATE HAVING JURISDICTION OR AN OPINION OF COUNSEL ACCEPTABLE TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR ACTS.*

3.6.4 Bio-Tech acknowledges that the Medbox Shares are not liquid and are transferable only under limited conditions. Bio-Tech acknowledges that such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Bio-Tech is aware of the provisions of Rule 144 promulgated under the Securities Act, which permits resale of securities purchased in a private placement subject to the satisfaction of certain conditions and that Rule 144 is not now available and, in the future, may not become available for resale of the Medbox Shares.

3.6.5 **Bio-Tech Sophistication and Ability to Bear Risk of Loss**. Bio-Tech acknowledges that it is able to protect its interests in connection with the acquisition of the Medbox Shares and can bear the economic risk of investment in such securities without producing a Material Adverse Effect (as hereafter defined) on Bio-Tech. Bio-Tech otherwise has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks associated with an investment in the Medbox Shares.

3.6.6 **Purchases by Groups**. Bio-Tech acknowledges that it is not acquiring the Medbox Shares as part of a group within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").

3.7 **Appointment to Board of Directors**. As a material inducement to Medbox to enter into this Agreement, Bio-Tech shall reserve one seat on its board of directors to be held by a designee of Medbox reasonably satisfactory to Bio-Tech. Initially, such nominee shall be Dr. Bruce Bedrick. In the event that Dr. Bedrick is unable to fill the position, such position shall be held by a then current director or officer of Medbox. Such designation right

shall expire at such time as Medbox holds less than ten percent (10%) of Bio-Tech's issued and outstanding common stock.

3.8 **Good Standing**. Bio-Tech is a corporation duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation and has all requisite corporate power and corporate authority to own, lease and operate its properties and assets and to carry on its business as currently conducted. Bio-Tech is duly qualified to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its properties or assets or the conduct of its business requires such qualification, except where the failure to be so qualified or in good standing, individually or in the aggregate, has not had a Material Adverse Effect on Bio-Tech. As used in this Agreement, "**Material Adverse Effect**" means any change, event, development, or effect that is materially adverse to the business, liabilities, properties, results of operations, condition (financial or otherwise) or working capital of a Party, or the ability of a Party to consummate on a timely basis the transactions contemplated by this Agreement; provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (a) any adverse change, event, development, or effect arising from or relating to the taking of any action contemplated by this Agreement, and (b) any adverse change in or effect on the business of a Party.

3.9 **Bio-Tech Lock-Up and Resale Leak-Out**.

3.9.1 **Lock-Up**. During the twenty-four (24) month period from the execution of this Agreement, Bio-Tech shall not (except as permitted below), without the prior written consent of Medbox, directly or indirectly, offer, issue, sell, contract to sell, grant any option for the sale of, pledge, or otherwise dispose of or transfer any the Medbox Shares (the "**Bio-Tech Lock-Up Period**").

3.9.2 **Resale Leak-Out**. Following the expiration of the Bio-Tech Lock-Up, Bio-Tech may dispose of the Medbox Shares at a maximum rate per quarter equal to the lesser of (a) 10,000 Medbox Shares or (b) 0.5% of Medbox's issued and outstanding common stock. After thirty-six (36) months from the execution of this Agreement, Bio-Tech may dispose of the Medbox Shares at a maximum rate per month equal to the lesser of (x) 25,000 Medbox Shares or (y) 0.5% of Medbox's issued and outstanding common stock. To ensure compliance with this **Section 3.9.2**, Bio-Tech agrees to provide Medbox with the name of the broker-dealer where the Medbox Shares are deposited and further agrees to provide Medbox with duplicate copies of all sell transactions involving the Medbox Shares.

3.10 **Dilution**. Bio-Tech hereby acknowledges and agrees that subsequent to consummation of the transactions contemplated hereby, the Bio-Tech Shares held by Medbox shall be subject to dilution only *pari passu* with shares of Bio-Tech common stock held by all other shareholders of Bio-Tech.

3.11 **Accounting Treatment**. Bio-Tech hereby agrees and acknowledges that Medbox shall be entitled to treat its investment in the Bio-Tech Shares under the equity method of accounting in accordance with GAAP to the extent permitted thereunder. The equity method in accounting is the process of treating equity investments, usually 20% - 50%, in associate

companies. The investor's proportional share of the associate company's net income increases the investment (and a net loss decreases the investment) and proportional payment of dividends decreases it. In the investor's income statement, the proportional share of the investee's net income or net loss is reported as a single line item.

3.12 **Transfer of Patents**. U.S. Patent numbers 8,086,470 and 8,335,697 (the "**Patents**") have been duly assigned and registered in the name of Bio-Tech. Bio-Tech shall not assign or transfer the Patents to any person or entity other than in connection with (a) a bona fide sale of the Company (whether by merger, stock sale, asset sale or otherwise); (b) a bona fide sale of the Patents for fair value to a third party in an arm's length transaction; (c) assignment to a wholly-owned subsidiary of the Company; or (d) a reverse merger of the Company into a publicly traded entity.

3.13 **Use of Funds**. Attached as **Exhibit C** hereto is a use of funds of the Cash Purchase Price. Bio-Tech intends to use the Cash Purchase Price substantially for the purposes and in the amounts set forth therein and as represented in the business plan given to Medbox during the due diligence phase of negotiations.

4. **REPRESENTATIONS, WARRANTIES AND COVENANTS OF MEDBOX.** Medbox hereby represents and warrants to and covenants with Bio-Tech as follows:

4.1 **Validity of Transactions**. This Agreement, and each document executed and delivered by Medbox in connection with the transactions contemplated by this Agreement, have been duly authorized, executed and delivered by Medbox and is each the valid and legally binding obligation of Medbox, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency reorganization and moratorium laws and other laws affecting enforcement of creditor's rights generally and by general principles of equity.

4.2 **Valid Issuance of Bio-Tech Shares**. The Medbox Shares that are being issued to Bio-Tech in exchange in part for issuance of the Bio-Tech Shares to Medbox as contemplated hereunder, will, upon issuance in accordance with the terms of this Agreement, be duly and validly issued, fully paid and non-assessable shares of common stock of Medbox, free of restrictions on transfer, other than restrictions on transfer under this Agreement and the Shareholders' Agreement and under applicable Federal and state securities laws, and will be free of all other liens, adverse claims and encumbrances of any type and nature whatsoever.

4.3 **No Violation**. The execution, delivery and performance of this Agreement will not violate any law or any order of any court or government agency applicable to Medbox, as the case may be, or the Articles of Incorporation or Bylaws of Medbox, and will not result in any breach of or default under, or, except as expressly provided herein, result in the creation of any encumbrance upon any of the assets of Medbox pursuant to the terms of any agreement or instrument by which Medbox or any of its assets may be bound. No approval of or filing with any governmental authority is required for Medbox to enter into, execute or perform this Agreement, except for applicable post-closing filings under Federal and applicable state securities authorities.

4.4 **Securities Law Compliance**. Assuming the accuracy of the representations and warranties of Biotech set forth in **Section 3** of this Agreement, the offer, sale and delivery of the Medbox Shares will constitute an exempt transaction under the Securities Act of 1933, as amended (the "**Securities Act**") and registration of the Medbox Shares under the Securities Act is not required. Bio-Tech shall make such post-closing filings as may be necessary to comply with applicable Federal and state securities laws, which filings will be made in a timely manner.

4.5 **Qualifications, Legal and Investment**. All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body of the United States including Federal and applicable state securities filings that are required in connection with the issuance of the Medbox Shares pursuant to this Agreement have been or will be, on a timely basis, duly obtained and are effective. No stop order or other order enjoining the sale of Medbox Shares have been issued and no proceedings for such purpose are pending or, to the knowledge of Medbox, threatened by the SEC, or any applicable state securities authorities. The sale of the Medbox Shares is legally permitted by all laws and regulations to which Medbox is subject.

4.6 **Receipt of Restricted Securities**. Medbox has been advised that the Bio-Tech Shares have not been registered under the Securities Act or any applicable state securities laws and that the Bio-Tech Shares are being offered and sold pursuant to the exemption from registration afforded by Section 4(a)(2) of the Securities Act and applicable state securities law exemptions, and that Bio-Tech's reliance upon Section 4(a)(2) of the Securities Act and applicable state securities law exemptions is predicated in part on the Medbox's representations and warranties contained in this Agreement.

4.6.1 Medbox acknowledges that the Bio-Tech Shares have not been registered under the Securities Act or applicable state securities laws, are being offered and sold pursuant to applicable exemptions from such registration for nonpublic offerings, and will be "**restricted securities**" as defined by Rule 144 promulgated under the Securities Act. The Bio-Tech Shares may not be resold in the absence of an effective registration thereof under the Securities Act and applicable state securities laws unless, in the opinion of the Medbox's counsel (which opinion shall be reasonably satisfactory to Bio-Tech), an applicable exemption from registration thereunder is available.

4.6.2 Medbox is acquiring the Bio-Tech Shares for its own account, for investment purposes only and not with a view to, or for sale in connection with, a distribution, as that term is used in Section 2(11) of the Securities Act, in a manner which would require registration under the Securities Act and applicable state securities laws.

4.6.3 Medbox understands and acknowledges that the Bio-Tech Shares will bear the following legend:

> *THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD OR TRANSFERRED*

*FOR VALUE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION THEREOF UNDER THE SECURITIES ACT OF 1933 AND/OR THE SECURITIES ACT OF ANY STATE HAVING JURISDICTION OR AN OPINION OF COUNSEL ACCEPTABLE TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR ACTS.*

4.6.4 Medbox acknowledges that an investment in the Bio-Tech Shares is not liquid and is transferable only under limited conditions. Medbox acknowledges that such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Medbox is aware of the provisions of Rule 144 promulgated under the Securities Act, which permits resale of securities purchased in a private placement subject to the satisfaction of certain conditions and that Rule 144 is not now available and, in the future, may not become available for resale of the Bio-Tech Shares.

4.6.5 **Medbox Sophistication and Ability to Bear Risk of Loss**. Medbox acknowledges that it is able to protect its interests in connection with the acquisition of the Bio-Tech Shares and can bear the economic risk of investment in such securities without producing a Material Adverse Effect on Medbox. Medbox has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks associated with an investment in the Bio-Tech Shares.

4.6.6 **Purchases by Groups**. Medbox is not acquiring the Bio-Tech Shares as part of a group within the meaning of Section 13(d)(3) of the Exchange Act.

4.7 **Good Standing**. Medbox is a corporation duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation and has all requisite corporate power and corporate authority to own, lease and operate its properties and assets and to carry on its business as currently conducted. Medbox is duly qualified to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its properties or assets or the conduct of its business requires such qualification, except where the failure to be so qualified or in good standing, individually or in the aggregate, has not had a Material Adverse Effect on Medbox.

4.8 **Medbox Lock-Up and Resale Leak-Out**.

4.8.1 **Lock-Up**. During the twenty-four (24) month period from the time Bio-Tech's common stock becomes subject to the reporting requirements of Sections 13 or 15(d) of the Exchange Act, Medbox shall not (except as permitted below), without the prior written consent of Bio-Tech, directly or indirectly, offer, issue, sell, contract to sell, grant any option for the sale of, pledge, or otherwise dispose of or transfer any the Bio-Tech Shares (the "**Medbox Lock-Up Period**").

4.8.2 **Resale Leak-Out**. Following the expiration of the Medbox Lock-Up, Medbox may dispose of the Bio-Tech Shares at a maximum rate per month equal to 0.5% of Bio-Tech's issued and outstanding common stock. To ensure compliance with this

**Section 4.8.2**, Medbox agrees to provide Bio-Tech with the name of the broker-dealer where the Bio-Tech Shares are deposited and further agrees to provide Bio-Tech with duplicate copies of all sell transactions involving the Bio-Tech Shares.

4.9 **Shareholders' Agreement.** Medbox hereby acknowledges that the Bio-Tech Shares may be subject to additional restrictions on transfer as provided in the Shareholders' Agreement.

5. **FURTHER ASSURANCES; COOPERATION.**

5.1 **Lobbying Efforts and Lobbying Fees**. As a material inducement to Bio-Tech to enter into this Agreement, Medbox hereby agrees to assist Bio-Tech in its lobbying efforts for the adoption of favorable state legislation with such time, labor and financial assistance as Bio-Tech may reasonably request. In the event that Medbox funds Bio-Tech's lobbying in a particular state (the "**Funded State**") pursuant to a budget agreed upon by the Parties and such lobbying efforts result in the adoption of legislation which is favorable to Bio-Tech's business, then, during the Term of the License Agreement (as defined therein), Medbox shall be entitled to receive a lobbying fee equal to twenty-five percent (25%) of the sales price, licensing fees and/or other gross revenue generated from sales or licenses of Bio-Tech's technology in the Funded State (whether payable in a lump sum or on an ongoing basis).

5.2 **Reseller Fees**. The Parties acknowledge that Medbox may, from time to time during the Term of the License Agreement (as defined therein), assist in attracting additional purchasers or licensees for Bio-Tech's technology. In the event Medbox is responsible for doing so, Medbox shall be entitled to receive a reseller fee equal to twenty-five percent (25%) of the sales price, licensing fees and/or other gross revenue generated therefrom (whether payable in a lump sum or on an ongoing basis). The reseller fees shall apply to any technology which Bio-Tech possesses and for which Medbox directly introduces the purchaser or licensing party.

5.3 **Reseller Agreement**. Following the First Closing, the Parties shall negotiate in good faith with respect to a more formal Reseller Agreement incorporating the terms of **Sections 5.1** and **5.2**, as well as representations, warranties, covenants and indemnities of the Parties customary for agreements of such type and nature.

5.4 **Further Assurances.** In addition to and not in limitation of **Sections 5.1, 5.2** and **5.3,** execute and deliver such instruments and take such other actions as the other Party, may reasonably require in order to carry out the purpose and intent of this Agreement.

6. **ADDITIONAL AGREEMENTS; COOPERATION.**

6.1 **Governing Law and Attorney's Fees**. This Agreement shall be governed by and construed under the laws of the State of California. In any action brought to interpret or enforce this Agreement, the prevailing Party shall be entitled to recover attorney's fees and costs from the non-prevailing Party at both the trial and appellate level.

6.2 **Successors and Assigns**. Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the Parties and their respective successors and assigns.

6.3 **Entire Agreement**. This Agreement and the Exhibits hereto, and the Shareholders' Agreement, the License Agreement and the other documents delivered pursuant hereto, constitute the full and entire understanding and agreement between the Parties with regard to the subject matter hereof and no Party shall be liable or bound to any other Party in any manner by any representations, warranties, covenants or agreements except as specifically set forth herein or therein. This Agreement and the Exhibits hereto supersede the Original SPA and the Exhibits thereto. Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the Parties and their respective successors and assigns, any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided herein.

6.4 **Severability**. In case any provision of this Agreement shall be invalid, illegal, or unenforceable, it shall to the extent practicable, be modified so as to make it valid, legal and enforceable and to retain as nearly as practicable the intent of the parties, and the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

6.5 **Amendment and Waiver**. Except as otherwise provided herein, any term of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely), with the written consent of the Parties.

6.6 **Notices**. All notices and other communications required or permitted hereunder shall be in writing and shall be effective when delivered personally, or sent by telecopier (with receipt confirmed), provided that a copy is mailed by certified mail, return receipt requested, or when received by the addressee, if sent by Federal Express or other overnight couriers, to the addresses set forth on the first page of this Agreement or to such other address as a Party may subsequently designate by notice given to the other Party pursuant to this **Section 6.6**.

6.7 **Counterparts**. This Agreement may be executed in one or more counterparts. Delivery of an executed counterpart of the Agreement or any Exhibit attached hereto by facsimile or .pdf transmission shall be equally as effective as delivery of an executed hard copy of the same. Any party delivering an executed counterpart of this Agreement or any exhibit attached hereto by facsimile transmission shall also deliver an executed hard copy of the same, but the failure by such party to deliver such executed hard copy shall not affect the validity, enforceability or binding nature effect of this Agreement or such Exhibit.

6.8 **Titles and Subtitles**. The titles of the Sections and Subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

*(Signatures appear on following page)*

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first set forth above.

**BIO-TECH MEDICAL SOFTWARE, INC.**

By: ______________________
Name: Steven Siegel
Title: CEO

**MEDBOX, INC.**

By: ______________________
Name:
Title:

# EXHIBIT A

## Shareholders' Agreement

# EXHIBIT B

## Amended and Restated Technology License Agreement

# EXHIBIT C

## Use of Funds

| | TOTALS |
|---|---|
| Debt Retired (Domino/Lasner Notes) | $[illegible]28,000 |
| Capitalized Investments (Equipment) | $[illegible]0,000 |
| Marketing & Advertising | $[illegible]00,000 |
| Lobbying | $[illegible]0,000 |
| Working Capital & General Corporate Purposes | $[illegible],072,000 |
| Total Funds Used | $[illegible],500,000 |

*** FILED: BROWARD COUNTY, FL HOWARD FORMAN, CLERK 7/10/2013 1:51:11 PM.****

# AMENDED AND RESTATED TECHNOLOGY LICENSE AGREEMENT

This Amended and Restated Technology License Agreement (the "**Agreement**") is entered into as of February 26, 2013 (the "Effective Date"), by and between Bio-Tech Medical Software, Inc., a Florida corporation with an address of 2805 E. Oakland Park Blvd., Suite 250, Fort Lauderdale, Florida, 33306 ("**Licensor**") and Medbox, Inc., a Nevada corporation with an address at 8439 W. Sunset Blvd., West Hollywood, California, 90069, ("**Licensee**"). Licensor and Licensee are sometimes referred to herein collectively, as the "**Parties**" and individually, as a "**Party**."

## RECITALS

**WHEREAS,** Licensee has developed and holds all Intellectual Property Rights in and to the Software; and

**WHEREAS,** effective as of February 8, 2013, the Parties entered into a Stock Purchase Agreement (the "**Original SPA**") and pursuant thereto, a Technology License Agreement with respect to the Software (the "**Original License Agreement**"); and

**WHEREAS,** effective as of February 26, 2013, the Parties have entered into an Amended and Restated Stock Purchase Agreement, which amended and restated the Original SPA in its entirety and pursuant to which the Parties are entering into this Agreement, which amends and restates the Original License Agreement in its entirety; and

**WHEREAS,** pursuant to this Agreement, Licensor is granting to Licensee a non-exclusive royalty-free license to incorporate the Software in Licensee's Production Hardware Environment in the Territory, subject to the terms and conditions set forth in this Agreement.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth in this Agreement, and intending to be legally bound, the Parties agree as follows:

1. **Definitions.**

In addition to capitalized terms defined elsewhere herein, the following capitalized terms will have the meanings set forth next to each:

1.1 **"Affiliate"** means a person or entity which controls, is controlled by or is under common control with a Party or any other person or entity.

1.2 **"Applicable Laws"** means all applicable laws, rules, and regulations, including any rules, regulations, guidelines, or other requirements of any regulatory authorities or other governmental authorities that may be in effect from time to time in any relevant legal jurisdiction in the Territory.

1.3 **"Documentation"** means all user documentation provided by Licensor to Licensee or made generally available by Licensor, as well as any specifications for the Software provided by or agreed to by Licensee.

1.4 **"Intellectual Property Rights"** means (a) all patents, patent rights, patent applications, and patent disclosures, (b) all inventions (whether or not patented, patentable or reduced to practice), and all modifications, derivative works and improvements thereto, (c) all trademarks, service marks, trade dress, logos, and trade names, (d) all copyrights, (e) all trade secrets and other protectable confidential information, and (f) all other proprietary rights relating to the Software which are owned by Licensor, including without limitation those set forth on **Exhibit A** hereto.

1.5 **"Production Hardware Environment"** means Licensee's biometric cannabis (marijuana) dispensing machines.

1.6 **"Software"** means Licensor's biometric cannabis (marijuana) inventory tracking software in the version in place as of the Effective Date and all updates and upgrades that are made generally available.

1.7 **"Territory"** means the United States of America, its territories and possessions.

2. **Licensed Rights.**

2.1 **License Grant.** Subject to Licensee's compliance with the terms and conditions set forth in this Agreement, Licensor grants to Licensee and its Affiliates a royalty-free, fully paid, non-exclusive, nontransferable, right and license to the Software in the Territory, solely for use in conjunction with and incorporated into Licensee's Production Hardware Environment.

2.2 **Sublicenses.** Licensee will not have the right to grant sublicenses under this Agreement in the Territory to third parties, who manufacture, license, market, sell, distribute, own and operate Licensee's Production Hardware Environment.

2.3 **Disclaimers.** THE SOFTWARE SHALL OPERATE AND FUNCTION IN ALL MATERIAL RESPECTS IN ACCORDANCE WITH THE DOCUMENTATION, WHICH DOCUMENTATION SHALL BE ACCURATE OR COMPLETE IN ALL MATERIAL RESPECTS. LICENSOR DOES NOT WARRANT THAT THE VALIDITY OF ANY OF THE INTELLECTUAL PROPERTY RIGHTS OR THAT PRACTICING THE INVENTIONS CLAIMED UNDER THE INTELLECTUAL PROPERTY RIGHTS WILL BE FREE OF INFRINGEMENT. EXCEPT AS EXPRESSLY SET FORTH IN THIS **SECTION 2.3**, LICENSEE ON BEHALF OF ITSELF AND ITS SUB-LICENSEES AGREES THAT THE SOFTWARE AND THE INTELLECTUAL PROPERTY RIGHTS ARE LICENSED "**AS IS**," AND LICENSOR NEITHER MAKES NOR HAS MADE ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE PERFORMANCE OF THE SOFTWARE INCLUDING ITS SAFETY, EFFECTIVENESS OR COMMERCIAL VIABILITY. EXCEPT AS SET FORTH IN THIS **SECTION 2.3** LICENSOR DISCLAIMS ALL WARRANTIES WITH REGARD TO THE SOFTWARE, INCLUDING ALL WARRANTIES, EXPRESS OR IMPLIED, OF WITH RESPECT TO FUNCTIONAL CONDITION PERFORMANCE OPERABILITY OR USE OF THE SOFTWARE ON ITS MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE. LICENSEE ASSUMES ALL RESPONSIBILITY AND LIABILITY FOR LOSS OR

DAMAGE CAUSE BY THE SOFTWARE, USED OR SOLD BY LICENSEE OR ITS SUB-LICENSEES.

3. **Term and Termination.**

3.1 **Term.** This Agreement is effective as of the Effective Date, and will remain in full force and effect until expiration of the patents and know-how included in the Intellectual Property Rights, unless otherwise earlier terminated as provided in this **Section 3**.

3.2 **Termination Rights and Events.**

(a) **Mutual Agreement**. This Agreement will terminate upon the mutual written agreement of the Parties.

(b) **Failure to Meet Payment Obligations Under the SPA Agreement.** Licensor will have the right to terminate this Agreement upon fifteen (15) days' written notice to Licensee if Licensee fails to make any payment of the Cash Purchase Price (as defined in the SPA) when due, unless such breach is cured with such fifteen (15) day period.

(c) **Other Breach by Licensee.** Licensor will have the right to terminate this Agreement upon fifteen (15) days' written notice to Licensee, if Licensee is in breach of any other provision of this Agreement, unless such breach is cured within such fifteen (15) day period.

(d) **Contesting the Validity of the Licensed Patents.** In the event Licensee commences any action court or administrative action that challenges the validity of any or all of the patents included in the Intellectual Property Rights during the Term, this Agreement shall automatically terminate effective as of the date Licensee commences any action.

(e) **Financial Difficulties.** Either Party will have the right to terminate this Agreement immediately upon written notice to the other Party, if that other Party becomes involved in financial difficulties as evidenced:

(i) by its commencement of a voluntary case under any applicable bankruptcy code or statute, or by its authorizing, by appropriate proceedings, the commencement of such a voluntary case;

(ii) by its failing to receive dismissal of any involuntary case under any applicable bankruptcy code or statute within ninety (90) days after initiation of such action or petition;

(iii) by its seeking relief as a debtor under any applicable law of any jurisdiction relating to the liquidation or reorganization of debtors or to the modification or alteration of the rights of creditors, or by consenting to or acquiescing in such relief;

(iv) by the entry of an order by a court of competent jurisdiction finding it to be bankrupt or insolvent, or ordering or approving its liquidation, reorganization, or any modification or alteration of the rights of its creditors or assuming custody of, or

appointing a receiver or other custodian for, all or a substantial part of its property or assets; or

(v) by its making as assignment for the benefit of, or entering into a composition with, its creditors, or appointing or consenting to the appointment of a receiver or other custodian for all or a substantial part of its property.

The failure by a Party to exercise its right to terminate this Agreement pursuant to this **Section 3.2** in the event of any occurrence giving rise thereto will not constitute waiver of the rights in the event of any subsequent occurrence.

3.3 **Effect of Termination.**

(a) The provisions of **Sections 3.3, 4, 5, 6, 7** and **8** of this Agreement will survive any termination of this Agreement, except as otherwise provided herein.

(b) Upon termination of this Agreement, all rights, privileges and licenses granted by Licensor to Licensee will immediately terminate and revert to Licensor and Licensee will thereafter not make any use whatsoever of the Software.

4. **No Reverse Engineering; No Derivative Works; No Illegal Activities; Compliance with Applicable Laws.** Licensee agrees not to directly or indirectly modify, reverse engineer, adapt, disassemble or decompile the Software, or any portion thereof, or create derivative works based on the Software or any part thereof. Licensee shall not modify any intellectual property notices contained in the Software. License agrees to use the Software only to engage in legal activities and will use it only in compliance with Applicable Laws.

5. **Ownership**. Licensee acknowledges that all copies of the Software in any form and the Intellectual Property Rights embodied therein are the sole property of Licensor. Licensee shall have no right, title or interest to any such Software, modifications or derivatives of the Software or copies thereof, except as provided in this Agreement. Licensor acknowledges that all use of the Software shall inure to the benefit of Licensor.

6. **Infringement of Intellectual Property Rights.**

6.1 **Notification.** Each Party will notify the other promptly in writing when any infringement of the Intellectual Property Rights by a third party is uncovered or suspected.

6.2 **Licensor's Enforcement Rights**. Licensor shall have the sole right to enforce the Intellectual Property Rights. Licensee will, at Licensor's expense, reasonably cooperate with Licensor with respect to such enforcement.

7. **Confidential Information.**

7.1 **Confidential Information Defined.** The Parties recognize that each may have disclosed to and received from the other, and may disclose to and receive from each other prior to the Effective Date and from time to time during the Term, certain information, regardless of form, concerning the operation, business, financial affairs, products, customers, technical and business information, or other

aspects of each other and their respective affiliates that may not be accessible or generally known to the public ("**Confidential Information**").

7.2 **Nondisclosure**. For the protection of Confidential Information, the Parties agree that Confidential Information acquired by any Party from the other Party will not be disclosed and will only be used as reasonably necessary for each Party to perform its obligations, or enjoy its rights, that are provided under this Agreement; provided, however, that the Confidential Information will not be published or disclosed by such Party to any other person or entity (except to legal counsel, in confidence), in any manner whatsoever, without the prior written approval of the other Party. Each Party shall, and shall cause its employees, agents, and every other person and entity it employs in connection with this Agreement, to protect and safeguard the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as such Party uses to protect its own confidential or proprietary information of a like nature.

7.3 **Disclosure in Judicial or Governmental Process.** In the event that either Party receives any demand from any third party for the disclosure of any Confidential Information, or is directed to disclose any portion of any Confidential Information received from the other Party in conjunction with a judicial or governmental proceeding or arbitration, then the Party requested or directed to make such disclosure shall immediately notify the other Party. Each Party agrees to provide the other Party with reasonable cooperation and assistance in securing a suitable protective order and in taking any other steps to preserve the confidentiality of such Confidential Information, but will not be in breach for complying with any legal obligation to disclose such Confidential Information.

7.4 **Exceptions.** The Parties agree that "**Confidential Information**" received by a Party shall not include:

(a) information that was rightfully in the possession of the receiving Party prior to such disclosure of the otherwise Confidential Information of the other Party;

(b) any information that becomes rightfully known to the receiving Party, without confidential or proprietary restrictions, from a source independent of and not in privy with the other Party, and that is disclosed to the receiving Party without breach of any confidentiality obligations, such information no longer being Confidential Information at such time of becoming rightfully known to the receiving Party; or

(c) any information that, as evidenced by its ordinary business records, is developed independently by the receiving Party without use of or reference to any of the Confidential Information received by such Party and without violation of any confidentiality restriction, such information no longer being Confidential Information at such time of independent development by the receiving Party.

7.5 **Injunctive Relief**. Each Party acknowledges that any unauthorized disclosure or use of the Confidential Information would cause the other Party imminent irreparable injury and that such Party shall be entitled to, in addition to any other remedies available at law or in equity, seek injunctive relief in the event the event of a breach or a threatened breach by the other Party or its obligations under this **Section 7**, without the necessity of posting a bond or other security.

8. **Indemnification.**

8.1 **Indemnification.** Licensee and its Sublicensees will defend, indemnify and hold harmless Licensor, its officers, directors, employees, agents, heirs, successors, assigns and representatives, (each an "**Indemnitee**") from and against any and all losses, damages, judgments, settlements, costs and expenses (including reasonable attorneys' fees) arising out of or incidental to any lawsuit, claim, demand or other action brought by or asserted by a third party resulting from or relating to any of the following (each an "**Indemnification Claim**"): (a) the negligence or willful misconduct of Licensee and/or its Sublicensees; (b) any material breach by Licensee of any obligation, representation, warranty, or covenant set forth in this Agreement; or (c) the failure to comply with Applicable Laws by Licensee or any of its Sublicensees; and/or (d) any allegation that personal injury or death, or any damage to any property, was caused or allegedly caused by a defect in the Software; and/or (e) any product liability claims related to the Software. Each Indemnitee is a third party beneficiary hereunder with respect to **Sections 8.1** and **8.2.**

8.2 **Process for Indemnification**. If an Indemnitee asserts an Indemnification Claim under this Agreement, then Licensor (and/or another Indemnitee) will notify Licensee in writing promptly upon becoming aware of any claim that it believes to be an Indemnification Claim (it being understood and agreed, however, that the failure by an Indemnitee to give such notice will not relieve Licensee of its indemnification obligation under this Agreement except and only to the extent that Licensee is actually prejudiced as a result of such failure to give notice). Licensee will have the right to assume and control the defense of the Indemnification Claim at its own expense with counsel selected by Licensee and reasonably acceptable to Licensor; provided, however, that an Indemnitee will have the right to retain its own counsel, with the fees and expenses to be paid by the Indemnitee, if representation of such Indemnitee by the counsel retained by Licensee would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceedings. If Licensee does not assume the defense of the Indemnification Claim as described in this **Section 8.2**, the Indemnitee may defend the Indemnification Claim but will have no obligation to do so. The Indemnitee will not settle or compromise the Indemnification Claim without the prior written consent of Licensee, and Licensee will not settle or compromise the Indemnification Claim in any manner which would have an adverse effect on the Indemnitee's interests, without the prior written consent of the Indemnitee, which consent, in each case, will not be unreasonably withheld, delayed, or conditioned. The Indemnitee will reasonably cooperate with Licensee at Licensee's expense and will make available to Licensee all pertinent information under the control of the Indemnitee, which information will be considered Confidential Information hereunder.

9. **Updates**. Licensor has the right, but no obligation, to periodically update the Software, at its complete discretion, without the consent or obligation to Licensee or any licensee or user. Licensor shall provide Licensee with any updates to the Software in accordance with the terms of this Agreement.

10. **Custom Engineering and Additional Services.**

10.1 **Custom Engineering**. Licensee may from time to time during the Term, request from Licensor changes, enhancements, improvements, additional features and or functionality be added to the Software. Licensor may, at its sole discretion agree to make such changes to the Software on such terms as may then be negotiated and agreed to by the Parties in an amendment to this Agreement or in a separate agreement. All such changes, enhancements, improvements or additional features and functionality to the Software created by Licensor shall remain the sole property of Licensor.

10.2 **Additional Services**. Licensee may, from time to time during the Term, request from Licensor, additional services to aid in the setup, installation and support of the Software on Licensee's Product Hardware Environment. Licensor may, at its sole discretion, provide such additional services on such terms as may be then negotiated and agreed to by the Parties in an amendment to this Agreement or in a separate Agreement.

11. **Miscellaneous**.

11.1 **Waiver**. No provision of the Agreement may be waived except in writing by both Parties hereto. No failure or delay by either Party hereto in exercising any right or remedy hereunder or under applicable law will operate as a waiver thereof, or a waiver of that or any other right or remedy on any subsequent occasion.

11.2 **Severability**. Should one or more provisions of this Agreement be or become invalid or unenforceable, then the Parties hereto will attempt to agree upon valid and enforceable provisions in substitution for the invalid or unenforceable provisions, which in their economic effect come so close to the invalid or unenforceable provisions that it can be reasonably assumed that the Parties would have accepted this Agreement with those new provisions. If the Parties are unable to agree on such valid and enforceable provisions, the invalidity or unenforceability of such one or more provisions of this Agreement will nevertheless not affect the validity or enforceability of the Agreement as a whole, unless the invalid or unenforceable provisions are of such essential importance to this Agreement that it may be reasonably presumed that the Parties would not have entered into this Agreement without the invalid or unenforceable provisions.

11.3 **Assignment; Successors and Assigns**.

(a) This Agreement is personal to Licensee, and Licensee may not assign or otherwise transfer this agreement, whether by written assignment, merger, reorganization, by operation of law or otherwise, without the prior written consent of Licensor, within Licensor's sole discretion. Any purported assignment or transfer of this Agreement without Licensor's approval will be void and not merely voidable. This Agreement will terminate at Licensor's election upon a Change of Control of Licensee, unless Licensor consents to this Agreement continuing in full force and effect upon such Change of Control. For purposes of the foregoing, a "**Change of Control**" of Licensee means: (i) an event or series of related events by which any natural person or business entity becomes the beneficial owner, directly, or indirectly through one or more intermediaries, of securities of Licensee representing fifty percent (50%) or more of (1) the outstanding common stock of Licensee or (2) the combined voting power of Licensee's then outstanding voting stock (in either case, the "**Voting Stock**"); (ii) Licensee is party to a merger, acquisition, share purchase, joint venture, consolidation, reorganization, amalgamation, or other transaction having similar effect (each a "**Business Change**") which results in the Voting Stock of Licensee outstanding immediately prior thereto failing to continue to represent (either by remaining outstanding or by being converted into voting securities of the surviving or another entity) at least fifty percent (50%) of the combined voting power of the Voting Stock of Licensee or such surviving or other entity outstanding immediately after such Business Change; or (iii) the sale or disposition of all or substantially all of Licensee's assets (or consummation of any transaction having similar effect) related to the Licensed Product.

(b) Licensor may assign this Agreement in whole or in part, within Licensor's sole discretion. Licensor will notify Licensee of any assignment.

(c) This Agreement will inure to the benefit of, and be binding upon and enforceable against, the permitted successors or assignees of each Party.

11.4 **Counterparts**. This Agreement may be signed in any number of counterparts (including by facsimile or .pdf transmission) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together will constitute the same Agreement.

11.5 **No Agency**. Nothing herein contained will be deemed to create an agency, joint venture, amalgamation, partnership or similar relationship between Licensor and Licensee. Neither Party will at any time enter into, incur, or hold itself out to third parties as having authority to enter into or incur, on behalf of the other Party, any commitment, expense, or liability whatsoever, and all contracts, expenses and liabilities in connection with or relating to the obligations of each Party under this Agreement will be made, undertaken, incurred or paid exclusively by that Party on its own behalf, and not as an agent or representative of the other Party.

11.6 **Notices**. All communications between the Parties with respect to any of the provisions of this Agreement will be sent to the addresses found on the first page of this Agreement, or to such other address as designated by one Party to the other by notice pursuant hereto. All such notices shall be sent by certified mail, return receipt requested or by documented overnight courier and shall be deemed given upon receipt.

11.7 **Governing Law**. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida (without regard to conflicts of law principles thereof or of any other State).

11.8 **Venue; Jurisdiction; Attorney's Fees**. In the event of any suit, action or otherwise under this Agreement or otherwise each Party hereby irrevocably agrees only to bring a proceeding in a Federal or state court of competent jurisdiction sitting in Broward County, in the State of Florida. Each Party to this Agreement hereby irrevocably waives, to the fullest extent permitted by law, any objections which they may now have or hereafter have to the laying of any such proceeding brought in an inconvenient form. The prevailing Party in any action brought to interpret or enforce this Agreement shall be entitled to receive attorneys' fees and costs at both the trial and appellate level.

11.9 **Headings**. The article, section and paragraph headings are for convenience of reference only and will not be deemed to affect in any way the language of the provisions to which they refer.

11.10 **Entire Agreement**. This Agreement and the Exhibit hereto contain the entire understanding of the Parties relating to the matters referred to herein, supersedes the Original Licensing Agreement and may only be amended by a written document executed on behalf of the respective Parties.

11.11 **Rules of Construction**. The use in this Agreement of the terms "**include**" or "**including**" means "**include, without limitation**" or "**including**, respectively.

11.12 **Preparation of Agreement**. Counsel for the Parties have participated in the preparation and review of this Agreement, and have negotiated it on behalf of their respective clients. For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties, and no ambiguity shall be resolved against any party by virtue of his, her or its participation in the drafting of the Agreement.

**IN WITNESS WHEREOF,** the parties have each executed this Agreement as of the Effective Date.

**LICENSOR:**

**BIO-TECH MEDICAL SOFTWARE, INC.**

By: ______________________
Name: Steven Siegel
Title: CEO

**LICENSEE:**

**MEDBOX, INC.**

By: ______________________
Name:
Title:

## EXHIBIT A

**Intellectual Property Rights**

U.S. Patent Number 8086470

U.S. Patent Number 8335697

Know-How related to the above Patents.

*** FILED: BROWARD COUNTY, FL HOWARD FORMAN, CLERK 7/10/2013 1:51:11 PM.****

**BIO-TECH MEDICAL SOFTWARE, INC.**
3101 n. Federal Highway, Suite #300
Fort Lauderdale, Florida 33306

May 13, 2013

Medbox, Inc.
8439 West Sunset Boulevard
Suite #101
West Hollywood, California 90069

Ladies and Gentlemen:

Reference is made to that certain Amended and Restated Purchase Agreement (the "**Purchase Agreement**") effective as of February 26, 2013 (the "**Effective Date**") by and between Medbox, Inc., a Nevada corporation ("**Medbox**") and Bio-Tech Medical Software, Inc., a Florida corporation ("**Bio-Tech**").

Pursuant to **Section 2.1.2** of the Purchase Agreement, the Second Closing was scheduled to take place on or before sixty (60) days from the Effective Date (April 27, 2013) and pursuant to **Section 2.1.3** of the Purchase Agreement, the Third Closing was scheduled to take place on or before ninety (90) days from the Effective Date (May 27, 2013). Medbox has requested and Bio-Tech has agreed to an extension of the dates for the Second Closing and the Third Closing.

Inconsideration for the extension, subject to execution of this letter by the Parties and payment by Medbox to Bio-Tech of the full Extension Fee (as provided for below), the Parties agree that the Second Closing shall be held on or before one hundred twenty (120) days from the Effective Date (June 26, 2013) and the Third Closing shall be held on or before one hundred eighty (180) days from the Effective Date (August 25, 2013).

Medbox shall pay to Bio-Tech the sum of $100,000 (the "**Extension Fee**") in two installments of $50,000 each, the first of which shall be paid within two (2) business days of the date of this letter by wire transfer in immediately available funds. The second $50,000 installment will be paid within fourteen (14) days thereafter using the same method of payment. The Extension Fee shall be non-refundable; provided, however, that in the event the Second Closing takes place in accordance with the terms of the Purchase Agreement, as amended hereby, the full Extension Fee shall be credited against the portion of the Cash Purchase Price due at the Second Closing.

All capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Purchase Agreement.

Except as amended hereby, the Purchase Agreement is ratified, approved and confirmed by Bio-Tech and Medbox, and remains in full force and effect.



**EXHIBIT C**

If the foregoing correctly sets forth our understanding with respect to amendment of the Purchase Agreement, kindly countersign this letter below and return it by facsimile or .pdf transmission.

Very truly yours,

**BIO-TECH MEDICAL SOFTWARE, INC.**

By: CEO
Steven Siegel, Ph.D.
Chief Executive Officer

*ACCEPTED AND AGREED TO THIS*
*13th DAY OF MAY, 2013.*

**MED-BOX, INC.**

By:
Name: Bruce Bedrick
Title: CEO



7229138 3